**Electronically Filed
Intermediate Court of Appeals
CAAP-23-0000493
18-DEC-2024
07:54 AM
Dkt. 95 MO**

NO. CAAP-23-0000493

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
PITA RAKUITA, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CPC-20-0000276)

### MEMORANDUM OPINION
(By: Hiraoka, Presiding Judge, Wadsworth and Nakasone, JJ.)

Pita **Rakuita** appeals from the July 27, 2023 Judgment of Conviction and Sentence entered by the Circuit Court of the First Circuit.[1] We vacate and remand for further proceedings.

### BACKGROUND

A grand jury indicted Rakuita for Sexual Assault in the Second Degree in violation of Hawaii Revised Statutes (**HRS**) § 707-731(1)(a).[2] At trial, the complaining witness (**CW**) testified that Rakuita was one of her "closest friends." On the

---

[1]     The Honorable Paul B.K. Wong presided.

[2]     HRS § 707-731 (Supp. 2018) provided:

   (1)   A person commits the offense of sexual assault in the second degree if:

      (a)   The person knowingly subjects another person to an act of sexual penetration by compulsion[.]

evening of February 23, 2019, CW and Rakuita were drinking with friends after a rugby match. CW told Rakuita "he was welcome to stay at my place, because I had an air mattress. And he said he had to take the bus. So I thought we were (indiscernible) that he could just stay over at my place." They went to CW's apartment. CW testified she was asleep, then:

> I felt like I was having a dream, but then I woke up, and it was Pita laying over me, fingering me.
>
> Q. And I'm sorry to be explicit. But can you explain to us what you mean by, fingering you?
>
> A. His fingers were going in and out of my vagina.
>
> Q. And when you say "fingers," was it more than one finger?
>
> A. One or two, yes.
>
> Q. And if you can be clear to us, was it one or two, if you can recall?
>
> A. Two.

Rakuita testified CW tried to kiss him, but he pulled away. They were on CW's bed, and "both just fell asleep there[.]" A "couple minutes later," he got "kicked out of her bed." CW told him to leave. Rakuita thought it was because he had rejected her advances. He left.

On February 26, 2019, CW called the Sex Abuse Treatment Center, then went to Kapiʻolani hospital where she made a police report. A sexual assault forensic examination was performed by Steven **Emura**, M.D. on February 28, 2019. He took two swabs from the area outside the lips of CW's vagina, which were marked as vulval swabs. He took four swabs of the inside of CW's vagina. The swabs were turned over to the Honolulu Police Department (**HPD**).

The State called Maria **Batangan**, the HPD criminalist who analyzed CW's swabs. Relevant to this appeal, Batangan testified that DNA testing is done "to determine if an association could be made between a DNA profile obtained from the item -- the questioned item of evidence that are collected from a

2

crime scene or a case, to a profile obtained from a known individual."  She explained the steps:

> The first step would be screening, in which I'm looking at the forens -- the items of evidence, excuse me, and determining if there's any samples that I can take through for serology and DNA testing, after which I would then perform DNA extraction.  That's a way to isolate DNA or take it out of the cell.
>
> Once DNA extraction is complete, I can then move on to quantification, which is the step where I can determine if DNA is present in the sample, and if so, how much.  This step, I also utilize a wide screen.
>
> Once quantification is completed, I can move on to amplification, which allows us to make many copies of the DNA at specific regions, which I can then take on through to DNA typing, which is where I can observe the actual profile obtained in the sample.

Batangan explained about testing the vulval and vaginal swabs:

> Q.     Can you explain what testing you performed on both?
>
> A.     I performed a DNA extraction, after which I continued on through quantification.  Again, quantification would tell me how much DNA was present in the samples.  In this step, *we also use -- utilized a wide screen.  This particularly will identify if there's male DNA within the sample itself*.

(Emphasis added.)

The deputy prosecuting attorney (**DPA**) asked:

> Q.     Let's turn specifically first for the vulval swabs.
>
> In terms of when you're screening for the presence of the male DNA, what did you determine?
>
> A.     Based on the results, *I determined that there was insufficient amount of DNA to produce an interpretable male DNA profile for the vulval swabs*.
>
> Q.     And turning to the vaginal swabs, what did you determine?
>
> A.     *For the vaginal swabs, screening for the presence of male DNA on the sample were negative*.
>
> Q.     And that's the (indiscernible) male profiles present for you to compare to a known sample?

A.    I didn't take it through to testing to be able to obtain a profile.  But based on lab protocols at the time, because *for the first sample, the vulval swabs, there was not enough DNA to produce an interpretable male profile*, I could stop for that sample.  And *for the vaginal swabs, because there was no male DNA indicated -- the sample was negative*, I also could stop.

Q.    Now, can you tell us about the possible reasons why there may be either insufficient DNA or no DNA present?

[(Defense objection overruled.)]

A.    It could be a number of things.  Sometimes it's just the nature of the sample.  There really isn't a male detected.  There really isn't enough --

[(Defense objection overruled.)]

So it may not be enough to be detected.  There may not be male DNA within the sample.  Sometimes it's the nature of the sample itself.  For example, maybe the sample was degraded over time.  Maybe it was the circumstances --

[(Defense objection to speculation overruled, running objection lodged.)]

(Emphasis added.)

Batangan testified on cross by the deputy public defender (**DPD**):

Q.    Okay.  So super clear, you tested dried secretions from the vulva?

A.    Yes.

Q.    You were testing for male DNA?

A.    Yes.

Q.    Result, negative?

A.    For the vulva?

Q.    Yes.

A.    It was that *there was an insufficient amount of DNA to produce an interpretable male profile*.

Q.    Okay.  Well, I'm reading your report and --

A.    Uh-huh.

Q.    -- it says, screening for the presence of p30 protein on sample 12 was negative; correct?

A.    That's correct.

Q.    So p30, negative; right?

4

A. Yes.

Q. And p30 is a marker of male DNA?

A. It's not a marker of male DNA. It's just -- it's just a protein found -- that can be found in semen.

Q. Okay. So only men have semen; right?

A. Yeah.

Q. Negative; right?

A. It was negative for the --

Q. Didn't find any? That's the point.

A. For that sample, yes, the p30 proteins were -- the p30 protein was negative.

Q. The finding was negative?

A. ***Just to clarify, the finding for male DNA was not enough to create an interpretable profile***, so I stopped the test at quantification.

Q. Because the p30 test was negative; right? There was no male DNA for you to -- no p30 for you to test?

THE COURT: No, there's two tests.

[DPD]: Yeah, I know. But I'm just saying --

THE COURT: So when you ask the question, ask which test.

Q. (BY [DPD]) Okay. Well, the point is your result that we just talked about was negative?

THE COURT: For which test?

[DPD]: For the p30 test, Judge.

THE WITNESS: Yes, ***the p30 test result was negative***.

(Emphasis added.)

She explained on redirect:

Q. Ms. Batangan, let's back up to the p30 test. Again, it's a test used to detect the presence of semen; is that right?

A. Yes.

. . . .

Q. So whether there's p30 or not is not something that you use to say there's male DNA or not?

A. That's correct. I still, regardless of --

5

regardless of the result of the p30 screening test, I still was able to take it through to DNA extraction, quantification.

. . . .

Q. (BY [DPA]) So if you can, now with that context, can you explain your result for the vulval swab?

A. Yes. So the vulval swabs, again, **there was not enough male DNA detected** to obtain an interpretable profile. So even if I were to proceed with analysis and get to the typing portion of the final stage, to obtain that profile, **it may have not been enough** to be utilized for comparison purposes.

(Emphasis added.)

Rakuita objected and moved to strike Batangan's testimony. This exchange followed:

[DPD]: (Inaudible) she's trying to (inaudible) --

THE COURT: Which test?

[DPD]: The test she's talking about. The test of the vulva. The result is negative.

THE COURT: No, she's saying that she didn't have enough sample or a quantifiable amount.

[DPD]: That's what (inaudible) is finding is (inaudible) is that it's negative.

[DPA]: (Inaudible.)

THE COURT: No, no. Hang on. Go ahead. No, no, no. Let him go.

[DPD]: (Inaudible.)

THE COURT: So give me your page. Give me the page on Exhibit 22.[3]

[DPD]: (Inaudible) trying to (inaudible) she's trying to do with this witness to say that screening for the presence of male DNA (inaudible) insufficient, and that they (inaudible), but there's no finding of that.

THE COURT: Well, hang on. I'm -- under conclusions; right? For dried secretions, vulva, there's two tests. First line is screening for the presence of p30 protein, negative. Screening for the presence of male DNA, insufficient amount for profiling (indiscernible).

_____

[3] State's exhibit 22 was described as "Official Report by HPD Criminalist Maria Batangan (3 pages)." It was not received in evidence and is not part of the record on appeal.

[DPD]: (Inaudible) that means.

THE COURT: That's what it says. That's what she's --

[DPD]: (Inaudible) means, and she's trying to --

THE COURT: Well, hang on. She can testify to the result of her exam. If you want to cross her as to what it means, you're allowed to do so.

[DPD]: Yeah, and she's done that five or six times already. And I keep objecting. (Inaudible) she trying to make up for (inaudible) there's a finding of male DNA.

THE COURT: But there's an insufficient amount of male DNA.

[DPD]: That's how they word it, Judge.

THE COURT: You can clarify that with Ms. Batangan. But that's what her conclusion is. That's what's written on Exhibit 22. She can testify to that.

The jury found Rakuita guilty of the included offense of Sexual Assault in the Fourth Degree.[4] He was sentenced to one year in prison. This appeal followed.

## DISCUSSION

Rakuita contends the trial court erred by: (1) denying his oral motion to preclude the State from arguing that male DNA was found on swabs from the vulva of the CW; (2) letting the State argue that male DNA was found on CW's vulval swabs; and (3) sentencing him to the maximum term for his misdemeanor conviction. Rakuita also contends there was prosecutorial misconduct during closing argument.

### 1.    The trial court did not abuse its discretion by denying Rakuita's oral motion.

After the close of evidence, Rakuita orally moved "to

---

[4]    HRS § 707-733 (Supp. 2018) provided, in relevant part:

(1)    A person commits the offense of sexual assault in the fourth degree if:

(a)    The person knowingly subjects another person, not married to the actor, to sexual contact by compulsion[.]

7

make sure that in her closing, [the DPA] isn't going to try to argue that DNA was found" on CW's vulval swab.  The trial court ruled:

> there was an insufficient amount of DNA to produce an interpretable male DNA profile.  Not that it's negative, but there's an insufficient amount of DNA to produce an interpretable male DNA profile.
>
> Based on those findings, the Court will allow Counsel to argue what those findings mean, whether or not it's what the expert says or what the expert didn't say.  You are allowed to argue and make the inferences that you can drawn out from that evidence.
>
> So with respect to precluding the State from saying that there's DNA on the swabs, the Court respectfully declines.

A trial judge has broad discretion to control closing argument.  State v. Nofoa, 135 Hawai‘i 220, 227, 349 P.3d 327, 334 (2015).  Prosecutors may draw reasonable inferences from the evidence and are allowed wide latitude to discuss the evidence. Id. at 228, 349 P.3d at 335.  But a prosecutor may not go beyond the record to "discuss matters outside the evidence adduced at trial."  Id. (cleaned up).  The defendant's fundamental right to confront the State's evidence may be compromised when the prosecutor refers to a fact not presented at trial during closing.  Id.

Batangan testified that her testing of the vulval and vaginal swabs "utilized a wide screen" that "will identify if there's male DNA within the sample itself."  For CW's vaginal swab, "there was no male DNA indicated -- the sample was negative[.]"  She never testified that CW's vulval swabs were negative for male DNA.[5]  Rather, she testified:  "there was insufficient amount of DNA to produce an interpretable male DNA profile for the vulval swabs"; "for the first sample, the vulval swabs, there was not enough DNA to produce an interpretable male

---

[5]     On cross-examination Batangan testified that CW's vulval swabs were negative for p30, but explained that p30 is "not a marker of male DNA. It's just -- it's just a protein found -- that can be found in semen."

profile[.]" When cross-examined she again testified, "there was an insufficient amount of DNA to produce an interpretable male profile. . . . Just to clarify, the finding for male DNA was not enough to create an interpretable profile[.]" On re-direct, she explained: "So the vulval swabs, again, there was not enough male DNA detected to obtain an interpretable profile. So even if I were to proceed with analysis and get to the typing portion of the final stage, to obtain that profile, it may have not been enough to be utilized for comparison purposes."

During the bench conference when Rakuita objected to Batangan's testimony, the defense acknowledged that Batangan's report (Exhibit 22) stated there was an insufficient amount of male DNA on the vulval swab for profiling. The trial court ruled that Batangan "can testify to the result of her exam. If you want to cross her as to what it means, you're allowed to do so." Rakuita never asked Batangan whether she meant there was an insufficient amount of DNA to establish a male profile as opposed to a female profile, or whether there was male DNA present but not enough to compare to Rakuita's DNA profile. On this record, we conclude the trial court did not abuse its discretion by denying Rakuita's oral motion.

> **2.** **The trial court did not err by overruling Rakuita's objection to the State's closing argument about male DNA and denying his motion to strike.**

Rakuita contends "[t]he trial court erred when it allowed the State to argue that the probability of [CW]'s account was supported by Batangan's testimony that male DNA was found on a swab of [CW]'s vulva." During the DPA's closing argument, this happened:

> The next step of the testing was the DNA testing, et cetera. And during the DNA testing, what Maria [Batangan] is trying to do is isolate a DNA profile from the vulva swabs as well as the vaginal swabs. And Maria was very clear. For the vaginal swabs, she determined that there was no male DNA at all on the vaginal swabs. However, Maria did determine that there was insufficient amount of DNA --

```
[DPD]:  I'm going renew my objection.

[DPA]:  -- to produce an interpretable --

THE COURT:  Objection overruled.

Proceed.

[DPA]:  However, Maria determined that there was an
insufficient amount of DNA to produce a interpretable male
DNA profile for the vulva swabs.  This meant there was the
presence of male DNA --

[DPD]:  Your Honor, I'm going to object to that.

[DPA]:  -- but there was not --

[DPD]:  I'm going to move to strike.

THE COURT:  Objection overruled, pursuant to the
record we made.  The motion to strike is denied.
```

The DPA's argument was supported by the evidence —
Batangan's testimony.  The trial court acted within its
discretion by overruling Rakuita's objection and denying his
motion to strike.

### 3.    There was prosecutorial misconduct, and it was not harmless beyond a reasonable doubt.

After the alleged incident, CW decided to talk to
Rakuita "to give him a chance to explain."  The DPA asked her:

```
Q.    And when you elected to set up this meeting with
the defendant on February 26, 2019, at that point, did you
know what you wanted to happen?

A.    No.

Q.    Did you have any intent of going to the police
yet?

A.    Not yet.

Q.    What were you hoping to have happened?

A.    For him to admit what he did.

Q.    And why was that important to you?

A.    I'm not sure.

. . . .

Q.    Did you record this conversation?
```

10

A.     Yes.

Q.     Why?

A.     Just so that I would have record of the converse -- conversation.

CW's recording of her conversation with Rakuita was admitted into evidence and played for the jury.[6]  Rakuita can be heard saying (among other things), "[CW], I can tell you this.  I never had sex with you.  I never had sex with you."  CW and Rakuita were the only witnesses to what happened at CW's apartment the early morning of February 24, 2019.  The jury's verdict would depend on whether they believed CW, or Rakuita.

During closing, the DPA argued:

> And last, what else makes [CW]'s account probable? Why did [CW] meet the defendant and make the recording?  It makes sense, and it is probable, because she knew it couldn't hurt, in this day and age when women still aren't believed.  She knew what the reaction would be.  She knew she would be second-guessed and doubted.

Rakuita argues this was prosecutorial misconduct because "[t]here is absolutely no evidence that was adduced at trial, which supported the State's argument[.]"  "Prosecutorial misconduct" is a legal term of art referring to any improper action by a prosecutor, even if harmless or unintentional.  State v. Cardona, 155 Hawaiʻi 23, 37, 556 P.3d 369, 383 (2024).  Prosecutors may draw reasonable inferences from the evidence and are allowed wide latitude to discuss evidence.  Nofoa, 135 Hawaiʻi at 228, 349 P.3d at 335.  But they may not introduce new information or evidence in closing argument.  State v. Browder, 154 Hawaiʻi 237, 241, 549 P.3d 322, 326 (2024).

Here, CW never testified she knew that women still aren't believed in this day and age.  Or that she knew what the reaction to her account of events would be.  Or that she knew she would be second-guessed and doubted.  The State argues there was

_____

    [6]     Rakuita objected at trial but does not challenge admission of the recording on appeal.

11

evidence that CW's account did ultimately cause friction within her and Rakuita's rugby club, there were negative reactions to her account, and some of Rakuita's friends did not believe CW. But that evidence involved events that happened after CW's conversation with Rakuita, and could not have informed what CW "knew" when she recorded the conversation.

The State argues the DPA "made this argument in order to explain why [CW] made a recording of her conversation with [Rakuita].  This was done in anticipation of the Defense questioning her motives for doing so."  But the DPA did not use qualifiers in her argument, such as "I submit that . . ." or "you can infer that . . .".  She made statements of fact for which there was no evidence in the record, thus introducing new information or evidence in closing argument.  That is "forbidden."  Browder, 154 Hawaiʻi at 241, 549 P.3d at 326.  Her argument could also have implied to the jury that she had "special or secret knowledge" of CW's motivation for recording the conversation.  Id. (quoting Am. Bar Ass'n, Criminal Justice Standards for the Prosecution Function, Standard 3-6.8(b) (4th ed. 2017)).  That too is misconduct.

> In prosecutorial misconduct cases, once the defense establishes misconduct — objection or no objection — appellate review is the same:  After considering the nature of the prosecuting attorney's conduct, promptness or lack of a curative instruction, and strength or weakness of the evidence against defendant, a reviewing court will vacate a conviction if there is a reasonable possibility that the conduct might have affected the trial's outcome. Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial.

Cardona, 155 Hawaiʻi at 37, 556 P.3d at 383 (cleaned up).

No curative instruction was given because there was no objection (we review for plain error).  While Rakuita does not challenge the sufficiency of the evidence, we cannot say the evidence of Rakuita's guilt was overwhelming.  The only two eyewitnesses gave directly conflicting testimony, the forensic

evidence was inconclusive, and the State didn't rule out any other man touching CW's vulva during the four days between the alleged event and Dr. Emura's forensic examination.  On this record, we conclude the prosecutorial misconduct was not harmless beyond a reasonable doubt because there is a reasonable possibility it affected the outcome of Rakuita's trial.  Cardona, 155 Hawaiʻi at 40, 556 P.3d at 386.

But we also cannot say that the prosecutorial misconduct here was so egregious that viewed under an objective standpoint, Rakuita was denied his right to a fair trial.  Thus, "reprosecution is not barred under the double jeopardy clause." State v. Basham, 132 Hawaiʻi 97, 111 n.12, 319 P.3d 1105, 1119 n.12 (2014).

We need not decide Rakuita's claim of sentencing error because we are vacating the judgment and remanding for further proceedings.  See U.S. v. Boulware, 384 F.3d 794, 812 (9th Cir. 2004) ("Given our reversal and remand for a new trial . . . no purpose would be served by our review of the sentencing issues.").

## CONCLUSION

The circuit court's July 27, 2023 Judgment of Conviction and Sentence is vacated, and this case is remanded for further proceedings consistent with this memorandum opinion.

DATED: Honolulu, Hawaiʻi, December 18, 2024.

On the briefs:

William H. Jameson, Jr.
Deputy Public Defender,
State of Hawaiʻi
for Defendant-Appellant.

Steven S. Alm,
Prosecuting Attorney,
Robert T. Nakatsuji,
Deputy Prosecuting Attorney,
City and County of Honolulu
for Plaintiff-Appellee.

/s/ Keith K. Hiraoka
Presiding Judge

/s/ Clyde J. Wadsworth
Associate Judge

/s/ Karen T. Nakasone
Associate Judge